1   Steven B. Stein, Esq. [SBN 52829]
    **LAW OFFICE OF STEVEN B. STEIN**
2   44 Montgomery Street, 36th Floor
    San Francisco, CA  94104
3   Tel.:  (415) 646-7171
    Fax:  (415) 981-1095
4
5   Attorneys for Plaintiffs, STEVE SHAPIRO
    and STEVE SHAPIRO MUSIC
6

7                   **UNITED STATES DISTRICT COURT**

8                  **NORTHERN DISTRICT OF CALIFORNIA**

9

10

11  STEVE SHAPIRO and STEVE SHAPIRO      ) Case No. 3:07-CV-5540 PJH
    MUSIC,                               )
12                                       ) **PLAINTIFFS' OPPOSITION TO**
                    Plaintiffs,          ) **DEFENDANT'S MOTION TO DISMISS**
13                                       ) **THE COMPLAINT OR, IN THE**
    vs.                                  ) **ALTERNATIVE, FOR A STAY**
14                                       )
    JUPITERIMAGES CORPORATION,           ) Date:  January 9, 2008
15                                       ) Time:  9:00 a.m.
                    Defendant.           ) Location:  Courtroom 3
16                                       )
17  _____     )

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................................... 1

II.  FACTS ............................................................................................................................ 3

    A.   The Steve Shapiro Music Library ............................................................................ 3

        1.   Introduction ................................................................................................... 3

        2.   Steve Shapiro Early Years ............................................................................4

        3.   Entry into the "Music Business" ...................................................................5

        4.   The Library Filing and Record Keeping System ...........................................6

    B.   Jupiter's Purchase of the Steve Shapiro Music Library .......................................... 7

    C.   Tracks That Did Not Meet the Warrantee Terms of the Contract .......................7

    D.   Events Leading to the Filing of the Declaratory Relief Action ...........................7

III. LEGAL ARGUMENT .......................................................................................................8

    A.   Declaratory Judgment Act ......................................................................................8

    B.   The First-to-File Rule Applies.................................................................................9

        1.   Chronology of the Actions. .........................................................................10

        2.   Same Parties................................................................................................ 11

        3.   Substantially Similar Issues.........................................................................11

        4.   Convenience of Witnesses and Parties.........................................................14

        5.   Relative Progress of Both Cases...................................................................15

    C.   Defendant's Second Assertion is Merely a Repeat of Its First Argument,
         and Should be Rejected For the Same Reasons ...........................................15

    D.   "There Can Be No Race to the Courthouse When Only One Party Is Running" ...... 16

IV.  CONCLUSION ...............................................................................................................18

1                                          **CASES**

2    *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937)............................................................... 8

3    *Alaris Med. Sys., Inc. v. Filtertek Inc.*, 2001 U.S. Dist. LEXIS 24976 (S.D. Cal. 2001)..................11

4    *Alibaba.com, Inc. v. Litecubes, Inc.*, 2004 U.S. Dist. LEXIS 3492 (N.D. Cal. 2004)................10, 11

5    *Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622 (9th Cir. 1991)............................10, 11, 16

6    *Amazon.com v. Cendant Corp.*, 404 F. Supp.2d 1256 (W.D. Wash 2005)..................................12

7    *American Guarantee and Liability Ins. Co. v. U.S. Fidelity & Guaranty Co.*,
8    2006 U.S. Dist. Lexis 88627 (W.D. Wash. 2006)...................................................................12

9    *AmSouth Bank v. Dale.* 386 F.3d 763 (6th Cir. 2004)...........................................................15

10   *Bridgelux, Inc. v. Cree*, 2007 U.S. Dist. LEXIS 53137 (N.D. Cal. 2007).............................8, 9, 10

11   *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986).......................13

12   *Dist. Council Health and Security Plan v. McKesson Corp.*,
13   2006 U.S. Dist. LEXIS 30584 (N.D. Cal. 2006).....................................................................12

14   *Feller v Brock*, 802 F.2d 722, 729 n. 7 (4th Cir. 1986).........................................................13

15   *First Nationwide Mortgage Corp. v. FISI Madison*, LLC,
16   219 F. Supp.2d 669 (D. Md. 2002)........................................................................13, 14, 17

17   *Genentech v. Eli Lilly & Co.*, 998 F.2d 931 (Fed. Cir. 1993)......................................................9

18   *Guthy-Renker Fitness, L.L.C. v. Icon Health & Fitness, Inc.*,
     179 F.R.D. 264, 271 (C.D. Cal. 1998)...............................................................................11, 17
19

20   *Isle Capital Corp. ex rel. LA-VC Trust v. Koch Carbon, Inc.*,
     2006 U.S. Dist. LEXIS 24866 (N.D. Cal. 2007)......................................................................10

21
     *Koch Engineering Co., Inc. v. Monsanto Co.*, 621 F. Supp. 1204 (E.D. Mo. 1985) ................. 10, 13
22

23   *Learning Network, Inc. v. Discovery Communications, Inc.*,
     2001 U.S. LEXIS 11881 (4th Cir. 2001) ...............................................................................17

24
     *MedImmune, Inc. v. Genentech, Inc.,*    U.S.   , 127 S.Ct. 764 (2007) .......................................9
25
     *Mediostream, Inc. v. Priddis Music, Inc.*,
26   2007 U.S. Dist. LEXIS 73707 (N.D. Cal. Sept. 24, 2007).....................................................10, 17

27   *N. Am. Cas. Ins. Co. v. Encompass Power Servs.*,
28   2005 U.S. Dist. LEXIS 33314 (E.D. Cal. 2005).....................................................................10, 12

*Nucor Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572 (7th Cir. 1994)..........16

*Oce-Office Systems, Inc. v. Eastman Kodak Co.*, 828 F.Supp.37 (N.D. Ill. 1993) .......................16

*Pacesetter Systems, Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94-5 (9th Cir. 1982) .......................9, 10

*Pakideh v. Ahadi*, 99 F.Supp.2d 805 (E.D. Mich. 2000) .....................................................10

*Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330 (Fed. Cir. 2007) ...................8

*Visx, Inc. v. Garabet*, 2000 U.S. Dist. LEXIS 19063 (N.D. Cal. 2000) ....................................10

*Ward v. Follett Corp.*, 158 F.R.D. 645, 648 (N.D. Cal. 1994) ..............................................17

*Z-Line Designs, Inc. v. Bell'O Intern., LLC*, 218 F.R.D. 663 (N.D. Cal. 2003) .....................11, 17

**STATUTES**

28 U.S.C. § 1404(a)...........................................................................................13

28 U.S.C. § 2201(a) .............................................................................................8.

New York U.C.C.§§ 2-312, 2-313 ..........................................................................12

# I. INTRODUCTION

The plaintiff herein is Steven Shapiro (hereinafter "Shapiro"), a Bay Area composer who in April 2006 sold the Steve Shapiro Music Library to Jupiterimages Corporation, (hereinafter "Jupiter") a publicly held company incorporated in Arizona, with its principal place of business in Connecticut and its technical music library operations located in Georgia.

In early 2006, Shapiro was contacted by Jupiter who asked to buy his library for inclusion in a music library that it intended to offer to the public. When Shapiro was initially contacted by Jupiter, the Shapiro library consisted of approximately 7000 music tracks. Jupiter was not aware at that time that Shapiro was not the composer/producer of all of those tracks, and that 5000 of them were "needle drops" or buy out music which Shapiro was permitted to utilize in his library for his clients, but Jupiter understood the issue and asked Shapiro those tracks to which he did have rights.

Eventually, Shapiro identified 2225 tracks to which he understood, believed, warranted, and represented to Jupiter that he had the legal right to sell. Jupiter agreed to purchase them on a per track basis. A copy of the contract between the parties has been filed with the Court and is incorporated into this brief by reference.

Knowing the library had been winnowed down from 7000 tracks to 2225 tracks, to meet the concern and potential that Shapiro was inadvertently transfer tracks to which he did not have sales rights, a term of the contract was that one-half of the contract purchase price would be withheld in escrow for a year to cover any indemnity obligations.

It was also agreed that:

> 5.1   Sellers agree to fully defend, indemnify and JUPITERIMAGES and its parent, subsidiaries, officers, directors, employees and affiliates harmless from, and against, any and all costs, damages, expenses, liabilities, and other claims, including attorneys' fees and court costs, that are in any way connected to Sellers' breach of any term of this agreement.

It was further agreed that:

> 6.1   _Limitation of Liability._   EXCEPT FOR FRAUD OR WILLFUL MISCONDUCT BY A PARTY, IN NO EVENT, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, OR SPECIAL DAMAGES RELATING TO THE IMAGES, INCLUDING, WITHOUT LIMITATION, ANY BUSINESS INTERRUPTION, LOSS OF GOODWILL, LOST PROFITS OR LOST SAVINGS.

1    As it turned out, approximately 400 tracks should not have been part of the transfer.

2    Shapiro immediately refunded the purchase price for those tracks, and he also met the terms

3 of the clause 5.1 of the contract, his indemnity obligation.

4    The parties worked very cooperatively over a period of five or so months.

5    At the end of September 2006, a dispute arose as to whether the inclusion of the 400 tracks

6 was willful or fraudulent so as to invoke paragraph 6.1, thus entitling Jupiter to be reimbursed for its

7 consequential and other types of damages as defined in that paragraph.

8    Shapiro refused to agree to reimburse any of those alleged Jupiter losses on the ground that

9 his mistake in including the tracks was totally inadvertent.

10    Very specific discussions were then undertaken between the attorneys for the parties as to

11 how best to proceed. Various potential courses of action were explored in a telephone conference

12 that was set up for that purpose.

13    Jupiter's General Counsel and Vice-President stated that Jupiter wished to complete all

14 aspects of dealing with the few third parties that were adversely affected by the Shapiro's mistake

15 (which are definitively covered under the indemnity provision of the contract – 5.1), and the parties

16 would then discuss resolution of the other issues.

17    He added that when the third party indemnity issues were resolved, the company at that time

18 would pursue a monetary recovery for the types of damages referenced in paragraph 6.1, as well as

19 total rescission of the contract.

20    Litigation between the parties was also discussed.

21    Jupiter's General Counsel and Vice-President stated, unequivocally, it was not the intent of

22 the Jupiter to file litigation at that point in time.

23    Shapiro's attorney responded he would think over all of the issues, but notwithstanding the

24 explicit assurance by Jupiter it was not going to file a lawsuit at that time, he advised that Shapiro

25 may choose to file a Declaratory Relief claim in the San Francisco Superior Court.

26    The filing is what occurred and Jupiter was so advised by an e-mail communication, a true

27 copy of which is attached as an exhibit to the Declaration of Steven B. Stein.

28 ///

1    Jupiter's response to the Declaratory Relief lawsuit was to remove it to this Court, and after
2    removal to file a lawsuit against Shapiro for damages in the United States District Court of
3    Connecticut.

4    Jupiter also then stopped cooperating with Shapiro as to the 5.1 counsel claims, so Shapiro
5    amended his Declaratory Relief action in this Court to include violation of what had been the agreed
6    course the parties' dealing with one another.

7    Plaintiff urges that (1) the within Declaratory Relief action will resolve all of the issues
8    between the parties because the essence of the dispute is the willfulness, or lack thereof, by Shapiro
9    in including the 400 tracks in the sale; (2) Shapiro filed the first action in a context that was not
10   forum shopping or a "race to the courthouse", and (3) virtually all of the witnesses and proof plaintiff
11   requires to support the relief he is seeking and to defend against defendant's claims (that would be
12   asserted here by cross-complaint or as a result of its Connecticut action being transferred here) are
13   located in California.

14   Therefore, defendant's motion for a stay or to dismiss should be denied.

15   The Court is also advised that the plaintiff in the near future will file in the District Court of
16   Connecticut a motion seeking a stay of that action pending this Court's decision herein, and to
17   conditionally order transfer of the Connecticut action to this Court if the defendant's motion is
18   denied.

19                                          **II. FACTS**

20   **A.    The Steve Shapiro Music Library**

21        **1.    Introduction.**

22        Steve Shapiro ("Shapiro") has been a Bay Area resident for the past thirty years. For the past
23   thirty five years, he has been a composer of original background music for film, TV, radio and video.

24        In that context and over the thirty five years he developed the Steve Shapiro Music Library
25   which consisted of approximately 7,200 individual music tracks  (consisting of instrumental music
26   with no lyrics), all of which were titled and organized to reflect musical descriptions and specific
27   visual images.

28

1  These music tracks were utilized in the production of various types of audio-visual
2  presentations as background music.

3  As an example, if a visual image was of a scene in France, music that "sounded French" was
4  connected to an audio impression and was located in the library through a key word. If the visual
5  image was dancing in France, that additional audio impression would be located by key word. The
6  same would apply if the dancing in France was in the rain.

7  **2.    Steve Shapiro Early Years.**

8  As a child, Steve Shapiro was considered a musical prodigy. He started music lessons and
9  played music on the flute and piano when he was five years old.

10  When he entered Brown University in 1964 at age 16, he had been playing the piano and flute
11  most of his life. He entered college to study science, but soon transferred to its Music Department.
12  Brown had one of the first electronic music studios, which resulted in access to four- track tape
13  recorders, high quality microphones, and one of the first Moog synthesizers in the world.

14  As a student, he started writing music in the traditional fashion - composing each
15  instrument's part note by note and writing it out in traditional musical notation. He wrote original
16  pieces but also created his own arrangements of classical compositions by Vivaldi, Bach, Mozart,
17  and others that could be played by fellow students.

18  With access to the Brown studio, he recorded his compositions and arrangements. If he made
19  up a tune or a new arrangement, his fellow students would play the instruments. Although he did not
20  know it at the time, the tracks he created over thirty yeas ago ultimately became the nucleus of the
21  Steven Shapiro Music Library.

22  These first tracks were recorded on quarter-inch analog tape, with several tracks on each tape
23  and descriptions written on the tape box. That was his original filing system. He was not at that time
24  thinking of these recordings as a "library", but merely exercises that helped him as a music student.

25  In the studio he learned how to add more tracks "on top" of existing tracks to create a much
26  bigger orchestral sound and how to add electronic sounds with the Moog synthesizer. It was the time
27  of the revolution in the 1960's, when technology allowed the merging of classical, jazz and pop
28  music.

1    What happened as well was the meaning of *"writing"* music changed and became less bound
2  to traditional notation. As jazz musicians had known how to do for years, all musicians were
3  learning to improvise and create new music in the studio using the technology and working together.

4    After graduating from Brown with a B.A. in music, Shapiro went to the Manhattan School of
5  Music in New York for a Masters degree, where he continued to compose, arrange, and record as
6  part of his advanced musical education.

7    **3.    Entry into the "Music Business".**

8    Shapiro entered the "music business" in 1970 when he was hired in New York City as a
9  music editor at Ross Gaffney, a large organization providing sound for motion pictures, commercials
10  and television. As a music editor, his job was to choose music for a piece of film and "edit" it to
11  "fit" the image on the screen. Editing in the 1970's involved physically cutting a piece of analog tape
12  so that musical score reflected and tracked pictorial events.

13    With access to a recording studio at Ross Gaffney, Shapiro continued to write, produce and
14  record music. He hired studio musicians to record music that he wrote and sometimes asked the
15  musicians to improvise on certain chords to elicit a particular mood and feeling. Sometimes the
16  musicians were paid a session fee, and sometimes it was just for fun. This process represented a
17  change in the composing process. Not every note had to be written down. The process was more
18  collaborative with various musicians adding their creative input and not just playing notes on a page.
19  These tracks also became part of his library.

20    In 1975, Shapiro left New York City and moved to California and he has resided here
21  continuously since that year. He became music director of Harcourt Brace Jovanovich, a large
22  educational publishing company in San Francisco. In 1980, Harcourt Brace bought Sea World and
23  moved to San Diego. Shapiro stayed in San Francisco and started Steve Shapiro Music Service.

24    To supplement the library of his own compositions he bought various needle drop and buyout
25  music libraries. These libraries were on 1/4" analog tape or vinyl. Later in that decade, CDs were
26  available. He would use the library to try different types of music against picture and to get client
27  feedback and would then usually compose and record an original piece of music based on the feel

28

1 | and style of the library track. The Library became an indispensable tool that allowed him to
2 | ascertain a client's needs and wishes.

3 | **4.    The Library Filing and Record Keeping System.**

4 | As the Library expanded, Shapiro saw the need to find different musical styles quickly. With
5 | the advent of computer databases, this possibility became a reality with a database management
6 | program called Filemaker Pro. Before this, he simply had old-fashioned binders with notes about
7 | each track.

8 | With Filemaker, he could type classify all the tracks according to descriptive keywords. If he
9 | wanted to find "lyrical orchestral," all the tracks that contained music with that phrase or those words
10 | as descriptive keywords would come on the screen and tell him where he could find each track. Of
11 | course, he needed to go through each track and input these descriptive phrases. This turned out to be
12 | an on-going process since it became obvious that the more detailed phrases each record contained,
13 | the better the database. So, over a period of years he would pull up a track and add more description
14 | to a particular track's list of keywords. The real power of the database was that it allowed him to put
15 | everything into one searchable database. All the commercial libraries and his original compositions
16 | were now all in one database.

17 | As technology changed, the library was transferred from analog tapes to digital tapes (DAT),
18 | then to CDs, and finally to files on computer hard drives. With these changes the database needed to
19 | reflect where to find the various tracks on each new medium. – i.e. DAT tape number, CD number or
20 | computer file name.

21 | As the year 2000 approached, there were fears that Filemaker Pro 2, which was used in 1999,
22 | was not Y2K compliant. He was upgraded to Filemaker 3, as recommended. After Y2K passed, it
23 | turned out that Filemaker 2 was not affected by Y2K and he went back to Filemaker 2, mostly
24 | because I had gotten used to it and it seemed to do everything I wanted. Over the next few years, he
25 | did upgrade Filemaker several times, stopping at Filemaker Pro 6.

26 | In 2005, after years of planning, the Steve Shapiro Music Library was out on-line, using the
27 | Filemaker Pro 6 database.

28 |

1    By 2005, the library had over 7000 plus tracks from various sources, which included his own
2  compositions, needle drop music libraries, buyout music libraries, and compositions that were given
3  to him by other composers with the understanding that they would receive a needle drop fee if the
4  track was ever used.

5  **B.    Jupiter's Purchase of the Steve Shapiro Music Library.**

6    In late 2005 Shapiro had received a phone call from Mike Bielenberg in Atlanta, Georgia, a
7  Jupiter Images manager stating that his "ship has come in".

8    He explained that Jupiter Images, a publicly traded company, was starting an internet music
9  sales company and wanted to buy his entire library for their new venture.

10    Shapiro told Bielenberg that he did now own the rights to each track in the library, and that a
11 substantial number were needle drops and buy-out tracks. Shapiro said he would have to pare down
12 the library from 7000 and remove those compositions that belonged to other people. Shapiro,
13 through the use of the Filemaker database of 7000 tracks, removed those tracks based on the
14 Filemaker records.

15    The library was pared down to 2225 tracks and the Asset Purchase Agreement was signed.

16 **C.    Tracks That Did Not Meet the Warrantee Terms of the Contract.**

17    It is not in dispute that for reasons that will be shown to be inadvertent and unintentional
18 (which reasons have orally been explained to Jupiter), approximately 400 of the transferred tracks
19 did not meet the warrantee and representation clause of the contract. Also to be proven is that the
20 remaining tracks transferred by Shapiro to Jupiter meet the terms of the contract.

21 **D.    Events Leading to the Filing of the Declaratory Relief Action.**

22    At the end of September 2006, a dispute arose as to whether the inclusion of the 400 tracks
23 was willful or fraudulent so as to invoke paragraph 6.1. Jupiter had demanded that Shapiro reimburse
24 it for its consequential and other types of damages which are defined in that paragraph. Shapiro
25 refused on the ground that his mistake in including the tracks was totally inadvertent.

26    Very specific discussions were then taken between the attorneys for the parties, and various
27 potential courses of action were explored in a telephone conference that was set up for that purpose.

28

1    Jupiter's General Counsel and Vice-President stated that Jupiter wished to complete all
2    aspects of dealing with the few third parties that were adversely affected by the Shapiro's mistake
3    (which are definitively covered under the indemnity provision of the contract – 5.1), and the parties
4    would then discuss resolution of the other issues. He added that the company would at that time be
5    pursuing a monetary recovery for the types of damages referenced in paragraph 6.1 as well as total
6    rescission of the contract.

7    Litigation between the parties was also discussed.

8    Jupiter's General Counsel and Vice-President specifically stated, unequivocally, it was not
9    the intent of the Jupiter to file litigation at that point in time and that he would not do so.

10    Jupiter's attorney responded that he would think over all of the issues. But notwithstanding
11    the assurance by Jupiter that it was not intending to file a lawsuit at that time Shapiro may choose to
12    file a Declaratory Relief claim in the San Francisco Superior Court. That is what occurred and
13    Jupiter was so advised by an e-mail communication, a true copy of which is attached to the
14    Declaration of Steven B. Stein, as an exhibit.

15                                    **III. LEGAL ARGUMENT**

16    **A.    Declaratory Judgment Act.**

17    "The Declaratory Judgment Act authorizes the court to 'declare the rights and other legal
18    relations of any interested party seeking such declaration' when there is an 'actual controversy.'"
19    *Bridgelux, Inc. v. Cree*, 2007 U.S. Dist. LEXIS 53137, *7 (N.D. Cal. 2007); 28 U.S.C. § 2201(a).

20    Declaratory relief is appropriate where the judgment will "serve a useful purpose in clarifying
21    and settling the legal relations in issue, and … will terminate and afford relief from the uncertainty,
22    insecurity, and controversy giving rise to the proceeding." *Guerra v. Sutton,* 783 F.2d 1371, 1376
23    (9th Cir. 1986).

24    The sole requirement for federal court jurisdiction under Article III of the U.S. Constitution
25    and the Declaratory Judgment Act is an 'actual controversy.' *Bridgelux,* 2007 U.S. Dist. LEXIS
26    53137 at *7, citing *Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1338 (Fed.
27    Cir. 2007); *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-41 (1937).

28    ///

1    The "actual controversy" requirement of the Declaratory Judgment Act "demands only
2 that the dispute be definite and concrete, touching the legal relations of parties having adverse legal
3 interests; that it be real and substantial and admit of specific relief through a decree of a conclusive
4 character, as distinguished from an opinion advising what the law would be upon a hypothetical state
5 of facts." *Bridgelux*, 2007 U.S. Dist. LEXIS 53137 at *8-9, citing *MedImmune, Inc. v. Genentech,*
6 *Inc.,*    U.S.    , 127 S.Ct. 764, 771-72 (2007).

7    Under the *MedImmune* all circumstances test, "a declaratory judgment plaintiff is required
8 only to show that, under 'all the circumstances,' an actual or imminent injury caused by the
9 defendant that can be redressed by judicial relief, and that is of 'sufficient immediacy and reality to
10 warrant the issuance of a declaratory judgment.'" *MedImmune,* 127 S.Ct. at 771. See also,
11 *Genentech v. Eli Lilly & Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993) ("When there is an actual
12 controversy and a declaratory judgment would settle the legal relations in dispute and afford relief
13 from uncertainty or insecurity, in the usual circumstance the declaratory judgment is not subject to
14 dismissal.")

15    Declaratory judgments also enjoy the same priority as any other action. *See Genentech*, 998
16 F.2d at 938 ("The considerations affecting transfer to or dismissal in favor of another forum do not
17 change simply because the first-filed action is a declaratory action.").

18    Here, plaintiff seeks declaratory relief with respect to the core issues in this contractual
19 dispute, including claims of fraud, misrepresentation, negligence and other alleged contractual
20 breaches. There is no doubt that there is a very real and substantial dispute between the parties based
21 on a specific set of facts which a declaratory judgment would dispositively resolve and terminate the
22 current uncertainty, insecurity and controversy giving rise to this action.

23  **B.    The First-to-File Rule Applies.**

24    The "first-to-file" rule is a doctrine of federal comity which permits a district court to decline
25 jurisdiction over an action when a complaint involving the same parties and issues has already been
26 filed in another district. *Bridgelux*, 2007 U.S. Dist. LEXIS 53137 at 11, citing *Pacesetter Systems,*
27 *Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94-5 (9th Cir. 1982).

28    In the absence of a sound reason that would make it unjust or inefficient to continue the first-

1   filed action, the general rule favoring the forum of the first-filed case applies. *Bridgelux*, 2007 U.S.

2   Dist. LEXIS 53137 at 11. "The first-to-file rule was developed to "serve[] the purpose of promoting

3   efficiency well and should not be disregarded lightly." *Alltrade, Inc. v. Uniweld Products, Inc.*, 946

4   F.2d 622, 625 (9th Cir. 1991); *Isle Capital Corp. ex rel. LA-VC Trust v. Koch Carbon, Inc.*, 2006

5   U.S. Dist. LEXIS 24866, *6, (N.D. Cal. 2007).

6          Courts look at three threshold factors when determining whether the first-to-file rule applies

7   to a suit: (1) the chronology of the two actions (i.e., which litigation was filed first); (2) the similarity

8   of the parties, and (3) the similarity of the issues. *Alltrade*, 946 F.2d at 625-26; *Pacesetter Systems,*

9   *Inc. v. Medtronic, Inc.*, 678 F.2d 93, 95 (9th Cir. 1982); *Bridgelux*, 2007 U.S. Dist. LEXIS 53137 at

10  *12.

11         When considering whether the first-to-file rule applies to case, the court in the first filed

12  action should also consider the convenience of parties and witnesses. *Mediostream, Inc. v. Priddis*

13  *Music, Inc.*, 2007 U.S. Dist. LEXIS 73707, *8 (N.D. Cal. Sept. 24, 2007).

14         If the first-to-file rule does apply to a suit, the court in which the ***second*** suit was filed should

15  stay or dismiss the proceeding in order to allow the court in which the first suit was filed to decide

16  whether to try the case.[1]  See *Alltrade*, 946 F.2d at 625; *Bridgelux*, 2007 U.S. Dist. LEXIS 53137 at

17  12. *See also, Visx, Inc. v. Garabet*, 2000 U.S. Dist. LEXIS 19063, *2, *4 (N.D. Cal. 2000)

18  (dismissal without prejudice); *N. Am. Cas. Ins. Co. v. Encompass Power Servs.*, 2005 U.S. Dist.

19  LEXIS 33314, *2-*3, *5 (E.D. Cal. 2005) (stay); *Alibaba.com, Inc. v. Litecubes, Inc.*, 2004 U.S.

20  Dist. LEXIS 3492, *2-*3 (N.D. Cal. 2004) (stay).

21         **1.    Chronology of the Actions.**

22         The chronological order of these actions is undisputed.  Plaintiff filed his action for

23  declaratory relief on September 27, 2007 and served defendant on October 3, 2007. The State court

24  action was removed to this Court on October 31, 2007.Defendant filed its complaint in Connecticut

25

26

27
_____
28  [1] [1] Plaintiff will file with the Connecticut District Court in the near future a motion to stay, and
    conditioned on this Court's decision, to transfer the Connecticut action to California.

1 on November 1, 2007.[2] The chronological requirement for the first-to-file rule is clearly met.

2          **2.    Same Parties.**

3          It is likewise undisputed that the parties to both actions are identical. Steve Shapiro and
4 Steve Shapiro Music are plaintiffs in this action and defendants in the Connecticut action, while
5 Jupiterimages Corporation is the defendant in this action and the plaintiff in the Connecticut action.
6 There are no missing and/or additional parties in either of these actions. Since all that is necessary
7 under this requirement is that both parties are "similar" (and not necessarily identical), this
8 requirement of the first-to-file rule has also been met, and plaintiff's action that is now in this Court
9 is the first-filed action.

10         **3.    Substantially Similar Issues.**

11         Although defendant goes to great lengths to point out the fact that this action and the action
12 filed in Connecticut differ somewhat in their allegations and the specific relief they seek, these
13 differences alone do not warrant a stay or dismissal of this action.

14         Indeed, it is well-settled that "the form of relief sought does not determine the similitude of
15 the issues" and that actions need only be substantially similar in order to meet the similarity of
16 actions requirement of the rule. See *Alibaba.com, Inc. v. Litecubes, Inc.*, 2004 U.S. Dist. LEXIS
17 3492, *6 (N.D. Cal. 2004). See als, *Alltrade, Inc.*, 946 F.2d 622 (affirming district court's finding
18 that first-to-file rule applied, despite fact that first-filed action involved additional claims and party);
19 *Inherent.com v. Martindale-Hubbell*, 420 F. Supp.2d 1093, 1097 (N.D. Cal. 2006) ("The 'sameness
20 requirement does not mandate that the two actions be identical, but is satisfied if they are
21 'substantially similar.'"); *Z-Line Designs, Inc. v. Bell'O Intern., LLC*, 218 F.R.D. 663, 665 (N.D.
22 Cal. 2003) (complete identity of the parties and issues is not required as long as both are "similar");
23 *Guthy-Renker Fitness, L.L.C. v. Icon Health & Fitness, Inc.*, 179 F.R.D. 264, 271 (C.D. Cal. 1998)
24 (same); *Alaris Med. Sys., Inc. v. Filtertek Inc.*, 2001 U.S. Dist. LEXIS 24976, 2001 WL 34053241 at

25

26 ───────────
[2] Defendant removed plaintiff's state court action to this Court on October 31, 2007, in advance of
27 filing its complaint in Connecticut.

28

1 \* 1956 (S.D. Cal. 2001) (same). Substantial similarity exists where the two cases rest on identical
2 factual allegations and assert either identical or analogous claims. *Dist. Council Health and Security*
3 *Plan v. McKesson Corp.,* 2006 U.S. Dist. LEXIS 30584, \*1 (N.D. Cal. 2006).

4     This case and the Connecticut action seek to resolve the same fundamental legal issues and
5 rest on identical factual issues concerning parties' rights and obligations under the same contract.

6     Although defendant argues that a dismissal or stay is warranted in this case because certain
7 issues raised in the Connecticut complaint would still be left unresolved, the declaratory relief sought
8 by plaintiff, if granted, would dispose of virtually all claims made against him in the Connecticut
9 action, including claims of fraud and intentional misconduct, claims of negligent and "innocent"
10 misrepresentation, rescission and indemnity issues. The remaining claims are brought pursuant to
11 sections 2-312 2-313 of the New York U.C.C. (per the terms of the contract) and under the
12 Connecticut Unfair Trade Practices Act. Either court can just as easily apply New York and/or
13 Connecticut law to these actions. The Connecticut Court in not in a uniquely superior position to
14 adjudicate these specific issues.

15     Furthermore, defendant filed a Notice of Related Action in this action on November 6, 2007,
16 thereby conceding that these actions are substantially related to each other. It is inconsistent for
17 defendant to argue that these cases and/or some of the causes or action lack substantial similarity
18 when defendant itself filed a "notice of related action" in this case. See *Amazon.com v. Cendant*
19 *Corp.*, 404 F. Supp.2d 1256 (W.D. Wash 2005).

20     Even if certain issues raised in the Connecticut are left unresolved by this action, defendant
21 has failed to establish why any of these additional issues would not justify departing from the first-
22 filed doctrine because the core issues of each case are the same and these peripheral concerns can be
23 resolved by joining the Connecticut action with this action. See *North American Casualty Ins. Co. v.*
24 *Encompass Power Services, Inc.*, 2005 U.S. Dist. LEXIS 33314, 12 (E.D. Cal. 2005).

25     Nor does defendant offer any explanation as to why its claims could not be adequately
26 addressed if brought as counterclaims in this action, or why its claims could not be adequately
27 addressed if the Connecticut action were transferred to the this Court. See *American Guarantee and*

28

1  *Liability Ins. Co. v. U.S. Fidelity & Guaranty Co.*, 2006 U.S. Dist. Lexis 88627, *12 (W.D. Wash.
2  2006).

3        Not surprisingly, defendant has not requested, as an alternative ground for relief, a transfer of
4  this action to Connecticut pursuant to 28 U.S.C. § 1404(a), since defendant clearly would have been
5  unable to meet its burden under that section, as the moving party, to show that the balance of
6  convenience of the parties and witnesses and the interest of justice weigh enough in favor of a
7  transfer overcome the strong presumption in favor of the plaintiff's choice of forum. See *Decker*
8  *Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986).[3]

9        Defendant's claim that the issues raised in the two actions are not identical are insufficient for
10 the Court to find an exception to similarity of issues requirement of the rule. There is nothing in the
11 first-to-file rule that requires a dismissal, stay (or transfer if properly requested) of a first-filed action
12 that is substantially similar to a later-filed action simply because the actions are not identical in all
13 respects. Nor is the fact that one action is for declaratory relief sufficient grounds to find an
14 exception to the rule, since the form of relief sought (including declaratory relief) does not determine
15 the similitude of the issues.

16       Defendant's apparent claim that an action for declaratory relief *must* be dismissed or stayed
17 whenever a later filed action contains some additional claims that are not contained in the first action
18 is a misstatement of the law, and its reliance on two District Court decisions from other jurisdictions
19 -- *Koch Engineering Co., Inc. v. Monsanto Co.*, 621 F. Supp. 1204 (E.D. Mo. 1985) and *First*
20 *Nationwide Mortgage Corp. v. FISI Madison*, LLC, 219 F. Supp.2d 669 (D. Md. 2002) – is entirely
21 misplaced.

22       In *Koch*, the court found that based on the facts of that case, the plaintiff's filing of its
23 declaratory relief action "represent[ed] only a race to the courthouse." 621 F. Supp. at 1207. The
24 facts and holding in *Koch* have nothing to do with this case, since this was clearly not a race to the

25

26 [3] Should the Court consider transferring this case for any reason, despite defendant's failure to
27 request that relief anywhere in its moving papers, plaintiff respectfully requests the opportunity to
   brief the issue and be heard on the matter before such a decision is made. See *Feller v. Brock*, 802
28 F.2d 722, 729 n. 7 (4th Cir. 1986).

1  courthouse (see discussion below). Furthermore, the plaintiff in *Koch* failed to identify any loss that
2  could be avoided through the use of the Declaratory Judgment remedy. *Id.* Here, it is abundantly
3  clear that the loss plaintiff will be able to avoid through declaratory relief is substantial.

4         The decision in *First Nationwide Mortgage Corp.* also turned primarily on the fact that the
5  action for declaratory relief was filed in anticipation of the imminent suit by defendant: "The factual
6  history of this dispute supports a finding that First Nationwide filed this action in anticipation of an
7  impending breach of contract lawsuit by FISI." 219 F. Supp.2d at 673.

8         In the absence of any authority to support defendant's bald assertions that this action for
9  declaratory relief should be dismissed or stayed merely because it is not identical to the Connecticut
10  action, and in light of defendant's failure to explain why the Connecticut action cannot just as easily
11  be transferred to this Court, why the Connecticut action could not be joined with this action or why
12  defendant's claims could not simply be asserted as counterclaims in this case, defendant's claim that
13  this Court should find an exception to the first-to-file rule should be rejected in its entirety.

14         **4.    Convenience of Witnesses and Parties.**

15         Convenience overwhelmingly favors litigation in this jurisdiction.

16         All material witnesses who would testify regarding plaintiff's alleged intentional and
17  negligent acts are located within this jurisdiction.

18         All evidence related to defendant's claims in Connecticut and plaintiff's claims in this Court
19  (along with Defendant's anticipated defenses here), including all tapes and soundtracks in plaintiff's
20  music library, and the advanced technology and devices used to record and store the tracks at issue in
21  this action and all other recording and production equipment that is material to this contractual
22  dispute are located in this jurisdiction.

23         On the other hand, with the possible exception of certain executives of Jupiterimages who
24  may or may not be located in Connecticut, there is no indication whatsoever that litigating the case in
25  Connecticut would better serve the interests of the parties, or witnesses or courts.

26         Defendant clearly does not consider the convenience of the parties or witnesses to this
27  contractual dispute important at all, since fails to even raise or address that issue in its moving
28  papers.

1    In the absence of any discussion or reference by defendant to the convenience of the parties
2  and/or witnesses in this action, and in light of the overwhelming number of material witnesses that
3  reside in the San Francisco area and amount of material physical evidence located in this jurisdiction,
4  convenience heavily favors litigation in the Northern District of California.

5        **5.    Relative Progress of Both Cases.**

6        Plaintiff was just recently served with process in Connecticut and no other proceedings have
7  occurred in that Court. Other than having a complaint on file, the Connecticut Court has no
8  familiarity with that action at all.

9        The proceedings in this Court, although still in their early stages, have progressed further than
10  those in Connecticut, and this Court now has a dispositive motion to dismiss or stay scheduled to be
11  heard in very early January.

12        Based on the progress of the case thus far in this Court and the lack of any activity yet in
13  Connecticut, it would be more cost effective and would minimize the possibility of duplicative
14  efforts by the Court if this Court maintains jurisdiction over this action and the Connecticut action is
15  moved here.

16  **C.    Defendant's Second Assertion is Merely a Repeat of Its First Argument, and Should be
        Rejected For the Same Reasons.**
17

18        Defendant's second argument -- that it is improper for a party to seek declaratory relief in one
19  court for some or all of his defenses to another claim filed against him in another court -- is
20  essentially the same argument defendant makes in support of its first claim, and should be rejected
21  for the same reasons as stated above.

22        Notably, rather than cite relevant statutory or caselaw from the Ninth Circuit or Northern
23  District of California, defendant attempts to import cases from other jurisdictions which apply a
24  different test and set of guidelines to determine whether the first-to-file rule should apply in
25  particular cases. See, e.g., *AmSouth Bank v. Dale*. 386 F.3d 763 (6th Cir. 2004) (Sixth Circuit case
26  applying five-factor test to determine when a district court should exercise jurisdiction over a
27  declaratory judgment which differs substantially from the test applied by the Ninth Circuit); *Pakideh
28  v. Ahadi*, 99 F.Supp.2d 805 (E.D. Mich. 2000) (Michigan District Court applying same five-factor

1    test used by Sixth Circuit); *Oce-Office Systems, Inc. v. Eastman Kodak Co.*, 828 F.Supp.37 (N.D.

2    Ill. 1993) (Illinois District Court applying somewhat different five-factor test to patent infringement

3    case). None of these cases are relevant or even helpful here.

4            In *Nucor Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572 (7th Cir. 1994),

5    another case cited by defendant, the Seventh Circuit Court applied the same five-factor test and in

6    fact held that the lower court's adjudication of the first-filed declaratory relief action in a contract

7    action was completely proper, despite the filing second-filed contract action, holding that the lower

8    court's ruling on the first-filed declaratory relief action would relieve the plaintiff's uncertainty and

9    insecurity concerning its legal relationship with the defendants, that the judgment would serve the

10   useful purpose of settling the contractual relationships between the parties and that, despite the

11   defendant's threats of litigation and its subsequent filing of a complaint, the plaintiff's filing of a

12   declaratory relief action first did not constitute a race to the courthouse. 28 F.3d at 579. The Court

13   went on state with approval that if a declaratory judgment will clarify and settle the disputed legal

14   relationships and afford relief from the uncertainty and controversy that created the issues, it is

15   usually resolved rather than dismissed. *Id.*

16           Defendant's claim that a court must dismiss a complaint seeking a declaratory relief simply

17   because it asserts certain claims that serve also as defenses to another action is completely

18   unsupported by any authority and again a misstatement of the law. Indeed, *Nucor*, *supra*, relied on

19   by defendant in support of this proposition, states just the opposite. imply because another complaint

20   concerning similar or identical issues is filed in another court is wholly unsupported by the law and

21   certainly not the law in this jurisdiction.

22   **D.    "There Can Be No Race to the Courthouse When Only One Party Is Running."**

23           A court may, in its discretion and under certain limited conditions, dispense with the first-

24   filed principle for reasons of equity. *Alltrade,* 946 F.2d at 628. The circumstances under which an

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
THE COMPLAINT OR, IN THE ALTERNATIVE, FOR A STAY
Case No. 3:07-CV-5540 PJH

1  exception to the first-to-file rule may be made include bad faith, anticipatory suit and forum

2  shopping. *Id.* Anticipatory suits are disfavored because they are examples of forum shopping.[4] *Id.*

3    In order for a suit to be viewed as anticipatory, the plaintiff must have received "specific,

4  concrete indications that a suit by defendant was imminent." *Mediostream,* 2007 U.S. Dist. LEXIS

5  73707 at \*7; *Z-Line Designs,* 218 F.R.D. at 665; *Ward v. Follett Corp.*, 158 F.R.D. 645, 648 (N.D.

6  Cal. 1994). In the absence of any evidence that a plaintiff received specific and concrete indications

7  that a suit is imminent, the filing of a complaint cannot be "anticipatory."

8    Veiled threats of a suit or the mere likelihood that the defendant will file suit are not enough.

9  For example, in *Guthy-Renker Fitness, L.L.C. v. Icon Health & Fitness,* 179 F.R.D. 264 (C.D. Cal.

10  1998), Precor, one of the defendants, argued that an exception to the first-to-file rule applied on the

11  grounds that plaintiff's declaratory judgment action was anticipatory in that it was brought in

12  response to an intent-to-sue letter sent by Precor's counsel. The court rejected Precor's contention.

13  Precor's letter expressly stated that it was giving notice of potential patent infringement in an attempt

14  to avoid litigation and, at best, the letter amounted to a veiled threat of legal action against plaintiff.

15  Accordingly, the court held that the defendant's letter "neither provided nor intended to provide

16  Plaintiff with a specific, concrete indication of imminent suit" within the meaning of the exception to

17  the first-to-file rule. *Id.* at 270.

18    Simply put, unless there is a showing of a very real and imminent threat by defendant to file

19  suit, "there can be no race to the courthouse when only one party is running." *First Nationwide*

20  *Mortgage Corp. v. FISI Madison*, LLC, 219 F. Supp.2d 669, 673 (D. Md. 2002), citing *Learning*

21  *Network, Inc. v. Discovery Communications, Inc.,* 2001 U.S. LEXIS 11881, \*10 (4th Cir. 2001).

22    Defendant contends in its moving papers that it filed a complaint in Connecticut federal court

23  "shortly after Shapiro filed his complaint." Memorandum, p.7.

24

25  [4] Even if there was evidence of "forum shopping" (which is not the case here), district courts have

26  found that forum shopping justifies an exception to the first filed rule only where the first filed suit
bears a slight connection to the forum in which it was filed as opposed to a stronger connection in the

27  second forum. *American Guarantee and Liability Ins. Co. v. U.S. Fidelity & Guaranty Co.,* 2006
U.S. Dist. Lexis 88627, \*10 (W.D. Wash. 2006).

28

1  Defendant then argues that that merely because it filed a complaint *after* plaintiff filed his
2  complaint plaintiff's action must now be deemed "anticipatory." for some unknown reason.
3  Defendant clearly misapprehends the law.

4  It is not the mere sequence of the filings that triggers an exception to the first-to-file rule.
5  Rather. finding an exception to the rule requires an affirmative showing by defendant that the
6  plaintiff received "specific, concrete indications that a suit by defendant was imminent" in advance
7  of his filing.

8  Defendant does not argue that it made any threats to sue or that it even suggested to plaintiff
9  that it intended to sue at some point before plaintiff filed his case.

10  Indeed, as set forth in the accompanying declaration of Steven B. Stein, throughout the
11  course of negotiations over a period of months and when the possibility of litigation was discussed,
12  defendant maintained unequivocally and clearly indicated to plaintiff and plaintiff's counsel that it
13  had no intention of filing a suit, nothwithstanding its knowledge that plaintiff was seriously
14  considering filing a declaratory relief action in California.

15  Specifically, defendant's General Counsel and Vice-President stated, unequivocally, that it
16  was not the intent of the Jupiter to file litigation at that point in time and that he would not do so.
17  Defendant's attorney further indicated that, notwithstanding the assurance by Jupiter that it was not
18  intending to file a lawsuit, he understood that plaintiff may choose to file a declaratory relief claim in
19  California.  See Declaration of Steven B. Stein., filed herewith and incorporated by reference herein.
20  See Stein Decalration.

21  Since there is absolutely no evidence that plaintiff ever received "specific, concrete
22  indications that a suit by defendant was imminent," and in light of the evidence establishing that the
23  opposite is actually true, there is no evidence that plaintiff's action was filed in bad faith, that it was
24  filed in anticipation of defendant's subsequent suit in Connecticut, or that plaintiff was attempting to
25  forum shop.

26  ### IV.   CONCLUSION

27  Defendant has failed to establish any basis for the Court to find an exception to the first-to-
28  file rule in this action or any other basis to warrant dismissal or a stay of this action. Accordingly,

1    plaintiff respectfully requests that defendant's motion to dismiss or, in the alternative, for a stay, be

2    denied in its entirety.   Based on plaintiff's intent to file in the near future with the District Court of

3    Connecticut a motion seeking a stay, transfer or transfer of that action, and the likelihood that

4    plaintiff will prevail on that motion, Plaintiff further requests that this Court issue a order

5    conditionally transferring the Connecticut action to this Court.

6

7    Dated: December 19, 2007                    Respectfully submitted,

8                                                **LAW OFFICE OF STEVEN B. STEIN**

9

10                                               _____
                                                 Steven B. Stein
11                                               Attorneys for Plaintiffs,
                                                 Steve Shapiro and Steve Shapiro Music
12

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
THE COMPLAINT OR, IN THE ALTERNATIVE, FOR A STAY
Case No. 3:07-CV-5540 PJH