Pages 1 - 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE PHYLLIS J. HAMILTON

```
STEVE SHAPIRO and STEVE SHAPIRO    )
MUSIC,                             )
                                   )
            Plaintiff.             )
                                   )
  VS.                              ) NO. C 07-5540 PJH
                                   )
JUPITERIMAGES CORP. et al,         )
                                   )  San Francisco, California
            Defendants.            )  Wednesday
                                   )  January 9, 2008
_____)  9:00 a.m.
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff**:          LAW OFFICE OF STEVEN B. STEIN
                            44 Montgomery Street
                            36th Floor
                            San Francisco, California 94104
                       **BY:  STEVEN B. STEIN, ESQ.**

**For Defendants**:         Jeffer, Mangels, Butler & Marmaro
                            1900 AVENUE OF THE STARS
                            7th Floor
                            Los Angeles, California 90067-4308
                       **BY:  JEFFREY K. RIFFER, ESQ.**

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                *Official Reporter - US District Court*
                *Computerized Transcription By Eclipse*

**P R O C E E D I N G S**

**JANUARY 9, 2008**                                              **9:00 a.m.**


            **THE CLERK:**  C07-5540, Steven Shapiro and others

versus Jupiterimages Corporation.

            Appearances, counsel.

            **MR. STEIN:**  Steven Stein appearing for Steven

Shapiro.

            **MR. RIFFER:**  Jeffrey Riffer for defendant

Jupiterimages Corporation.

            **THE COURT:**  What's the name again?

            **MR. RIFFER:**  I'm sorry, your Honor.  Jupiterimages.

            **THE COURT:**  No, your name.

            **MR. RIFFER:**  Jeff Riffer.

            **THE COURT:**  Counsel who are going to argue the

motion, please come to the lectern.  Defendant is on that side,

plaintiff is on that side.

            All right.  Now, defense counsel, you practice in the

Central District regularly?

            **MR. RIFFER:**  Correct.

            **THE COURT:**  For some reason everyone down here uses

these blue backers.  We don't use them here.  Please don't put

them on the files.  They are --

            **MR. RIFFER:**  You are absolutely right, your Honor.

That was a mistake.  I apologize.

```
 1          THE COURT:  For some reason Southern California
 2   lawyers always put these blue things on their briefs.
 3          MR. RIFFER:  I'm sorry.
 4          THE COURT:  We don't require it and it's an
 5   annoyance.
 6          All right.  This matter is on for hearing on the
 7   defendant's motion to dismiss or stay and request for judicial
 8   notice.  As the documents that you seek to have the Court
 9   judiciously notice are proper, that motion will be granted.
10          But with regard to the motion to dismiss or stay, I
11   have reviewed your papers.
12          Mr. Riffer, is there anything else you wish to add?
13          MR. RIFFER:  No, your Honor.
14          THE COURT:  All right.  Mr. Stein, did you wish to
15   say anything in opposition to the motion?  I have reviewed your
16   papers as well.
17          MR. STEIN:  I see, your Honor.  I have reviewed the
18   Mediostream decision that your Honor rendered on September 24,
19   2007.  I am prepared to -- using that decision as a guide to
20   your Honor's thinking --
21          THE COURT:  I don't remember anything about the
22   decision, so why don't you --
23          MR. STEIN:  I am prepared to orally argue my
24   position, your Honor.  I have never been before you in the
25   past.
```

1              **THE COURT:**  All right.

2              **MR. STEIN:**  I think this -- I would like to present

3     things to you, but I know that your Honor is busy and I don't

4     want to repeat what I have said.

5              I will try to say things differently, but what I'm

6     basically doing is using your Honor's decision in the

7     *Mediostream versus Priddis Music* case as the outline for my

8     presentation.

9              **THE COURT:**  I have 400 cases and I hear a dozen

10    motions a week.  I don't remember *Mediostream*.  So if you think

11    that it has a bearing, you should argue it.

12             **MR. STEIN:**  All right, your Honor.

13             Your Honor, the opposition to the transfer is based

14    upon a series of levels of discussion of factual issues that

15    your Honor in her discretion in whether to keep a declaratory

16    case under the declaratory judgments act is broad as discretion

17    could possibly be.

18             And so the question is whether or not there is an

19    actual controversy.  And in the dec relief case initially filed

20    in the San Francisco Superior Court, removed to this Court,

21    whether or not there was an actual controversy.

22             In order to present that to you, I would like to take

23    two or three minutes to talk about the ongoing process that led

24    to the filing of the dec relief case so that your Honor would

25    have the basis as is in my papers, but would also have the

1  basis from oral argument and some additional information I

2  would like to provide as to what that controversy was and how

3  it happened.

4          I will say by means of outline that there is another

5  issue in the case as to whether or not this was a race to the

6  courthouse or not, and there are some factual issues that are

7  involved in that.  I have submitted a declaration to your Honor

8  that's very clear in terms of my position.  And then there is a

9  counter declaration that changes one of the facts, and I will

10 get to that.

11         And then the issue is also, as your Honor laid out,

12 and again using the road map of, you know, what is fair to the

13 parties.  And that's basically, your Honor, the outline.

14         Your Honor, this case involves something very

15 interesting which most people see, hear, experience every day,

16 but, yet, they don't know how it happens.  And that is, seeing

17 a visual, usually on television -- let's limit it to

18 television -- and music that is played in the background and

19 how that music is created, chosen and committed to a particular

20 video.

21         **THE COURT:**  The programming or commercials, doesn't

22 matter?

23         **MR. STEIN:**  I'm so sorry, your Honor?

24         **THE COURT:**  In both regular programming and in

25 commercials?

```
 1          MR. STEIN:  Yes.  I would say it more applies to
 2   commercials, but it also would apply to regular programming.
 3   I don't watch that much television to have a memory of
 4   programming, but -- oh, I know what it would be.
 5          If you have these info commercials, that would be
 6   something that could be music to that.
 7          So the question is:  How is that put together?  How
 8   do they put the music to the visual.  And then what else
 9   happens?  What else happens is the music is intended to broaden
10   the experience of the visual.  And so it really goes to
11   emotions.  It goes to feelings.  It goes to perceptions.  It's
12   trying usually to sell.
13          Steve Shapiro in the Bay Area is one of the leading
14   composers and individuals whose service is to put music to a
15   visual.
16          THE COURT:  He doesn't write all the music that he
17   puts to visuals, does he?
18          MR. STEIN:  He writes 90 percent of it, maybe
19   95 percent of it.  After having a client sample his earlier
20   music and the earlier music that has been created by others,
21   for which he has the rights to show to the client and for which
22   when he uses that other music written by other people, he pays
23   them a fee, and the fee is in the nature of $50 or $75.  It's
24   called needle drop music.
25          And so what he does is to first sample the other
```

1   people's music and in sampling other people's music, he gets a

2   sense of what the client is looking for.  And then he has a

3   flute and a keyboard and what he is able to do, because he is a

4   musical -- he was a musical prodigy as a child, what he is able

5   to do is then say, "How about if we do it this way?"  And he

6   plays the flute and then -- okay.

7          Now, he created what's called the Steve Shapiro Music

8   Library and thought to himself, you know, I do this for

9   clients, maybe I can put this on the internet as well and maybe

10  I can sell at least the songs that I have written and songs

11  that other people have written and then would pay fees if it

12  was somebody else's music, and that was his concept.

13         Well, Steve Shapiro works in a little room where he

14  has all his equipment, but as it turns out, there are others

15  who have the same idea, because in the evolving world of

16  digital and computers and things that I certainly didn't grow

17  up with, people are trying to do all kinds of creative things.

18         So Jupiter had an idea that this is a very good

19  things to do, and so we are going to -- we are a publicly

20  traded company and what we are going to do is we are really

21  going to put this out there as a business.

22         Now, I'm going to -- let me go back to the creative

23  process.  The key to the creative process are key words.  And

24  the creative process of using the key words also involves a

25  database.

```
 1          I'm going to say to your Honor that it is almost
 2   impossible to describe what I'm explaining to you.  I did,
 3   however -- and Mr. Riffer has not seen it yet.  I did create an
 4   audio visual presentation, which, unfortunately, was just
 5   finished yesterday, which explains all this.  So I want to get
 6   back to that a little bit later, but I was enthralled by it --
 7          THE COURT:  As interesting as this is, I don't know
 8   that it has any bearing on this motion.
 9          MR. STEIN:  It doesn't until I -- because I haven't
10   gotten to the point where I explain how the problems arose.
11          There is a database.  Jupiter said to Steve Shapiro,
12   "We are starting this business.  We want to purchase your
13   library".
14          Steve Shapiro said to Jupiter, "I have no rights to
15   sell all of the music in my library.  There are 7,000 tracks in
16   my library and I only wrote 2,000 of them."
17          So Jupiter said, "That's fine.  Take out the ones
18   that are not yours.  We want to buy your tracks."  And they
19   entered into a written contract.
20          And the contract basically said, you are going to
21   give us your tracks.  We are going to pay you on a per track
22   basis.  We are going to -- we want you to take out the ones
23   that are not yours and we want you to represent and warrant
24   that these are your tracks, and he said fine.
25          In addition, we are going to put in an indemnity
```

1  agreement and the indemnity agreement is going to be very clear

2  and it is going to lay out exactly what it is is you are

3  responsible for.

4         In addition, we are going to agree to a limitation of

5  liability, and the limitation of liability basically says that

6  no party shall be entitled to incidental, consequential,

7  indirect or special damages.  And that's Article 6.1 of the

8  contract.

9         So -- and other than fraud or willful misconduct,

10  there can be no -- there won't be any consequential damages.

11         As it turned out, and this is very hard to

12  understand, 400 of the 2,200 tracks turned out not to meet the

13  warranty standards.

14         **THE COURT:**  Why is that hard to understand?

15         **MR. STEIN:**  How can that -- it's hard to understand

16  how that could happen when somebody is transferring this music.

17  Lay people -- I couldn't understand it.  Other people I have

18  talked to have not understood it.

19         But it happened and I represent to the Court that I

20  can prove and would prove in the context of this case, as I

21  said to Jupiter, that even though it sounds terrible, I will

22  prove to you that it was inadvertent.  It was not fraud.  It

23  was not willful.

24         Over a period of time when these tracks became known

25  not to meet the warranty standards, I was the negotiator and

 1   discussing with Jupiter how these issues would be handled.

 2   That occurred over a period of months, and over that period of

 3   months a problem track arose.  The problem track was dealt

 4   with.  The indemnity was covered and all of the agreements as

 5   to 5.1, which is a simple indemnity agreement, all of those

 6   were completely dealt with.  A period of months.

 7            There then came a time when there was a discussion

 8   with the senior general counsel of the company, who basically

 9   said, look, we want consequential damages as well.  And I said,

10   the contract doesn't provide for consequential damages unless

11   there is fraud or willful misconduct and that's not present

12   here.

13            And he said, It is present here.  It is present here

14   just because ipso facto 400 tracks out of 2,000, 2,200, what

15   are we talking about?  How can it not be?

16            I said, it's not fraud.  It's not willful misconduct

17   and we have a dispute about that.

18            And so we then talked about -- he said, well, also,

19   we want to rescind and we don't want any of these tracks any

20   more.

21            And I said, look, there is no basis for rescission.

22   There is certainly no basis for fraud, and we certainly have an

23   immediate dispute over whether or not there is willful

24   misconduct or fraud.

25            So he said -- I said, how are we going to resolve

1    this?  How can we do this?

2          And he said -- this is Mr. Eisenberg.  "I'm not

3    interested in trying to resolve this now.  My belief is we

4    should continue to handle all of these issues with indemnity as

5    they come up.  We claim and want consequential damages and we

6    will deal with that later."

7          It was -- I stand before your Honor as an officer of

8    the court.  I stand before your Honor speaking under penalty of

9    perjury, which is in my declaration.  That is correct is the

10   discussion and it was absolutely 1,000 percent clear that

11   Jupiter was not intending to file any litigation regarding that

12   discussion.

13          I specifically said --

14          **THE COURT:**  Did he say, "We do not intend to file any

15   litigation with regard to consequential damages"?

16          **MR. STEIN:**  No.  "At this time."  "At this time."

17          **THE COURT:**  And that time was what time, September

18   26th?

19          **MR. STEIN:**  '5th or '6th, yes.  At this time.  And

20   until we finish, until this process is finished.

21          I then said, look, if there is going to be litigation

22   at the end of all of this, I want that litigation to be in

23   California because in order for Steve to meet the challenges

24   that are coming up, it really has to be in California.  The

25   witnesses are in California.  It makes no sense for him to try

1   to meet that challenge in Connecticut.

2           So even though -- I can almost quote myself --

3           **THE COURT:**  So you did talk about litigation with

4   Mr. Eisenberg.

5           **MR. STEIN:**  No question I talked about it.  No

6   question that I talked about it.  And I said to Mister --

7           **THE COURT:**  Did you tell him that you were going to

8   file a declaratory relief action the very next day?

9           **MR. STEIN:**  Yes.  I said, what I'm going to do is I'm

10  going to think about it.

11          He asked me not to -- he asked me not to file and

12  said it wouldn't be a good thing.

13          I said, I have to give a lot of thought to whether to

14  do that or not.  I think it's time to meet that challenge, and

15  I have to think about it and I'm going to think about it over

16  the weekend.  And so --

17          **THE COURT:**  But you didn't think about it over the

18  weekend.  You filed, roughly, the next day, didn't you?

19          **MR. STEIN:**  No.  My belief your Honor is -- and I'm

20  looking for my notes as to the dates.

21          **THE COURT:**  The state court action was filed on

22  September 26.  Your declaration says that the conversation --

23  I'm sorry, September 27 it was filed.

24          Your declaration says that the conversation took

25  place on September 26.  Mr. Eisenberg says it took place on

1  September 27.

2          But in any event it happened either -- you either

3  filed on the same day or the very next day.

4          **MR. STEIN:**  I would like to look at my -- I just have

5  to look at my -- my email of --

6          **THE COURT:**  I'm sorry.  Mr. Eisenberg says that the

7  -- you filed the lawsuit on September 28th having had the

8  conversation with him on the 27th.

9          He's clearly wrong because the lawsuit is stamped

10 filed September 27th.  So I'm assuming that your declaration is

11 correct.  You say the conversation took place on

12 September 26th.

13         **MR. STEIN:**  I would refer your Honor to my email that

14 is the dated September 30th, which is attached as an exhibit to

15 my declaration.

16         And I wrote to him:

17         "Mitch, because we are so far apart on the issues

18     of the scope of indemnity and whether Jupiter is

19     entitled to consequential damages, I decided to go

20     ahead and file a dec relief action in the

21     San Francisco Superior Court."

22         I wrote to him that on September the 30th, 2007.

23         **THE COURT:**  Sunday, September the 30th.

24         **MR. STEIN:**  Please, your Honor?

25         **THE COURT:**  Sunday, September 30th you wrote that.

1          **MR. STEIN:**  So it would have been filed on that

2  Friday.

3          **THE COURT:**  So you wrote him this letter after you

4  had already filed it?

5          **MR. STEIN:**  Absolutely.

6          **THE COURT:**  All right.  Which means that you filed it

7  on Friday, September 28th.

8          **MR. STEIN:**  Very, very possible.  I'm sorry for not

9  having the dates in my mind.

10          **THE COURT:**  And your conversation with him in which

11  you told him you were going to think about it occurred on what

12  day, Thursday the 27th?

13          **MR. STEIN:**  Either Wednesday or Thursday, and I'm not

14  sure which.

15          **THE COURT:**  All right.

16          **MR. STEIN:**  But the main point of that is this, your

17  Honor --

18          **THE COURT:**  So, in other words, you thought about it

19  overnight.

20          **MR. STEIN:**  That's right, and talked to my client

21  about it.  That's right.  And came to the conclusion --

22          **THE COURT:**  Didn't you just say that you told him

23  that you were going to think about it over the weekend?

24          **MR. STEIN:**  My recollection as I stand here now is

25  that was my recollection, and that is my recollection, and that

1  is exactly what I just said, of course, your Honor.

2          It may have been -- it may have been I thought about

3  it and filed it the next day.  I just don't remember.  And I

4  apologize to the Court because the documents clearly show that.

5          But there is a very interesting rule of these issues

6  about whether or not there truly is a race to the courthouse,

7  and the fact is --

8          **THE COURT:**  I would say if you filed it the next day,

9  that sounds pretty much to me like a race to the courthouse.

10          **MR. STEIN:**  There can only be a race if there are two

11  horses racing.  And I actually cited case law, which I can find

12  for your Honor, not from this Court but from another Court.

13          And the fact is that the -- as your Honor wrote:

14          "A suit is anticipatory when the plaintiff filed

15      upon receipt of specific concrete indications that a

16      suit by defendant was imminent."

17          The context of this filing was that the suit by the

18  defendant not only was not imminent, but was -- was truly

19  stated that it's not going to be filed.

20          **THE COURT:**  That's not exactly what Mr. Eisenberg

21  says.

22          **MR. STEIN:**  That's true.

23          **THE COURT:**  And I should believe you more than I

24  should believe him?

25          **MR. STEIN:**  Yes.

1          THE COURT:  And tell me why.

2          MR. STEIN:  Okay.  I would like to present to your

3    Honor an exhibit.  May I hand up an exhibit, your Honor?

4          This is an exhibit I served on Mr. Riffer titled,

5    "To Be Submitted By Plaintiff During Oral Argument In Support

6    Of Race To The Courthouse Factual Dispute."

7          MR. RIFFER:  We object, your Honor.  He served this

8    on us yesterday.  We served this motion in November, before

9    Thanksgiving.

10         THE COURT:  This is not part of the exhibits that you

11   submitted in your opposition?

12         MR. STEIN:  No.

13         THE COURT:  All right.  And what's your reason for

14   not making it a part that exhibit?

15         MR. STEIN:  Because the information here that I will

16   present to your Honor -- and I will certainly present it orally

17   if you prefer -- could not have been known until I read Mr.

18   Eisenberg's declaration.

19         THE COURT:  And that was in -- attached to his reply

20   brief or the opening brief?

21         MR. STEIN:  Yes.

22         THE COURT:  Was it attached -- was Mr. Eisenberg's

23   declaration submitted in support of the reply or the moving

24   papers?

25         MR. RIFFER:  It was the reply, your Honor.

1          **THE COURT:**   Okay.  And that was filed two weeks ago.

2          **MR. STEIN:**   That was filed two weeks ago and was

3    followed by -- let me orally explain what this is and then your

4    Honor can decide if she wishes to accept it, if I may.

5          What I did was to serve a notice to produce documents

6    adhering on the motion to dismiss.  In the cover communication

7    I stated to Mr. Riffer -- and I served this, by the way, as

8    intending to go to the two attorneys.  I said -- I will

9    represent to your Honor that Mr. Eisenberg's assistant,

10   Samantha Siegel, takes copious notes on everything that is said

11   at these hearings, at these meetings that we held.

12         I was well aware -- I was well aware that she was

13   taking notes.  She told me she did.  I stated in my -- I stated

14   in my cover request -- I made a request to produce those notes

15   at the hearing.

16          I stated:

17          "Here is a formal notice asking for production of

18          the hearing."  I'm going to paraphrase to move

19          forward.  "Samantha told me she takes very detailed

20          notes of all phone conferences.  Obviously,

21          contemporaneous notes of a phone conference are

22          evidence of what was said.  My recollection of what

23          was stated between Mitch and me is very different

24          from Mitch's declaration.  In particular, I quite

25          vividly remember he did not advise me of an intention

1          to immediately file litigation or to file on

2          October 1, 2007.  I expect that claim to have done so

3          will not be supported by sample that's notes."

4               I close by saying, to Mr. Riffer:

5               "Prove me wrong by producing Samantha's notes.

6          If they support Mitch's declaration, the result would

7          surely be I look bad to the judge and that could be a

8          key factor in whether the case stays in California."

9               The response from Mr. Riffer was an objection that

10    states that rule 26 provides exceptions, that a party may not

11    seek discovery, et cetera.

12               But the cover email from Mr. Riffer is quite

13    revealing.  The cover says -- because it reflects that

14    Mr. Riffer spoke to his client.  He basically said:

15               "Mr. Eisenberg's declaration is supported by your

16          declaration and your actions.  You admit in your

17          declaration that litigation was discussed."

18               You then -- I'm paraphrasing, your Honor.  I don't

19    want to read it word for word.  Check the boxes declaratory

20    relief complaint.  The complaint does not provide facts.

21               What this reflects -- what this reflects, your Honor,

22    this email, is that Mr. Riffer conferred with his client to

23    determine if there were notes.  He conferred -- he could have

24    obtained those notes, and I respectfully urge to the Court that

25    this -- that the request to produce, the reason for production,

1   the refusal to produce, the mention of discussions with

2   Mr. Eisenberg that are referenced in Mr. Riffer's complaint at

3   least provide the Court an inference, at least provide the

4   Court an inference that my statement is true and that the notes

5   do not reflect that.

6           And I stand before your Honor and again repeat under

7   penalty of perjury that it was extremely clear in my

8   conversation that I was giving very serious consideration to

9   filing litigation.

10          I represent to the Court that if the notes are

11  ordered to be produced -- and, frankly, your Honor, I would

12  urge your Honor before you make a final decision to ask for

13  those notes to be produced, because I think they do reflect and

14  support that this was not a race to the courthouse; that

15  this -- that you can't have a race unless you have two horses,

16  and that my decision and my recommendation to my client to file

17  immediately and not use the process that Jupiter wanted to use,

18  which is let's finish all the indemnities and let's -- after we

19  finish that indemnity with third parties, then we will address

20  this.

21          My decision was it's time to bring this to a head.

22  And I did not race to the courthouse.  I walked very quickly

23  because I made the decision that in the ongoing process that it

24  was -- it was the best way to deal with the claim of fraud was

25  to file that litigation.

1            And I would urge your Honor the standard that your

2    Honor at least articulated in this other situation, which is

3    specific contract indications that a suit by defendant is

4    imminent, that's the *Z-Line Designs* case, 48 Federal Supp.2d,

5    1188.

6            And I will leave it at that.  I mean, I can't say

7    more about that.

8            **THE COURT:**  All right.

9            **MR. STEIN:**  I'm going to stand now, your Honor,

10   because I think I have raised the two issues of -- of the

11   convenience of the plaintiff, the ability of the plaintiff to

12   defend the claims of fraud.  If any acts of fraud took place,

13   they took place in California.  If there were witnesses to the

14   fraud, they took place in California.  There is no relationship

15   of Jupiter in any of this except its executive offices are in

16   Connecticut.

17           There are questions -- and the last signature was

18   signed -- of the contract was signed in Connecticut.

19           So on the basis of what is fair to the parties --

20   and, again, asking your Honor to look very hard at the question

21   of whether or not the mere fact that I filed the next day as

22   opposed to two days later or three days later or a week later,

23   not in the face of imminent filing by the other side, is the

24   disfavored race to the courthouse, which obviates plaintiff's

25   first -- the rule that usually exists, which is first to file

```
 1  sets the venue.
 2              THE COURT:  All right.  Response?
 3              MR. RIFFER:  Yes, your Honor.
 4          Mr. Stein's own statements to this Court show that he
 5  was in an improper race to the courthouse.  He said, there was
 6  no question that we talked of litigation with Mr. Eisenberg.
 7  And the very -- there is no question he told you today that he
 8  told Mr. Eisenberg that he would think about it over the
 9  weekend and, yet, the very next day he ran into state court.
10          It was a check-the-box complaint.  It said nothing
11  with further evidence that it was a race to the courthouse.  He
12  just checked a few boxes.  He didn't even say what declaration
13  he wanted the Court to issue.  All he said was there is a
14  dispute.  Obviously, it was a race to the courthouse, in light
15  of his own comments.
16          Nothing that Mr. Stein said today goes to the heart
17  of what our papers said, including our moving papers and our
18  reply.  It is unquestioned that dec relief is discretionary,
19  and the courts look at what factors.
20          The first is that declaratory relief is not to be
21  used to try a case piecemeal or to settle some issues, but not
22  the entire controversy.
23          In Connecticut we have the entire dispute.  We have
24  nine or ten causes of action for damages, punitive damages.  In
25  contrast, in this case all that Mr. Shapiro, the plaintiff, is
```

1  asking for is declaratory relief on four limited issues.  It

2  does not cover everything.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          We have cited cases, the *Villo* (phonetic spelling)

2    case, which was a Southern District of California case that

3    just came out in November of 07, and then two cases that are

4    virtually directly on point, the *Koch* case and the *First*

5    *Nationwide* case, that deal with a declaratory relief that was

6    filed initially in one court, and then the lawsuit for the

7    entire controversy in another court.  And in both *Koch* and

8    *First Nationwide* also in *Villo* (phonetic spelling), in each of

9    those cases the Court dismissed the declaratory relief action.

10          Here Mr. Stein's opposition papers concede that the

11    Connecticut action is broader than this case.  He concedes on

12    Page 12 of his papers that the UCC and Unfair Trade Practices

13    are not part of this case.

14          Obviously, he has got nothing in this case dealing

15    with punitive damages, with fraud, with -- that you have got a

16    claim in the Connecticut case that Mr. Stein himself -- acting

17    on behalf, of course, of his client, Mr. Shapiro -- breached a

18    confidentiality term in the contract.  Contract says it's

19    confidential, not to be disclosed.  Yet, it was an exhibit to

20    the state court complaint.

21          There is nothing in the declarations that he is

22    asking in this Court that have anything to do with that.  The

23    result is that if this Court took this case, it would not

24    resolve the entire controversy and that's an improper use of

25    declaratory relief.

```
 1          The second main point is that declaratory relief is
 2   improper when its only purpose is to defeat liability in a
 3   subsequent coercive case.  We cited the American South Bank
 4   case, which is was a Sixth Circuit case, which was an abuse of
 5   discretion to retain declaratory relief case in that action.
 6          And, third, we have already talked about is
 7   declaratory relief actions are disfavored when they are filed
 8   in anticipation of another lawsuit.
 9          We urge the Court to dismiss this case.
10          MR. STEIN:  May I say one more thing in reply?
11          THE COURT:  Well, the defendant is the moving party.
12   The defendant gets the last word.  He simply acceded his first
13   argument to you.  You have made your argument, so you don't get
14   the last word on this.
15          However, I will give you two minutes to make any
16   further statements and then, once again, Jupiterimages gets the
17   last word.
18          MR. STEIN:  Thank you, your Honor.
19          To meet the issue of whether or not in that
20   Connecticut case a motion, as indicated in our papers, was
21   filed before Judge Arterton in Connecticut.  It's a motion to
22   stay.  And in the event your Honor rules that the declaratory
23   relief action stays here in California, that she order that the
24   Connecticut case be transferred here.  That motion was filed
25   yesterday.  And that's before Judge Arterton, not set for
```

1  hearing until February 15.

2      So in the event there is a decision by the Court to

3  keep the case here, I'm sure as a matter of comity and the

4  cooperation among the federal district courts that Judge

5  Arterton would send the case here for all purposes.

6      **THE COURT:**  You are sure of that?

7      **MR. STEIN:**  Yes, your Honor.  I am sure of it because

8  I believe --

9      **THE COURT:**  I don't understand how you can file a

10  motion before a district judge and come to another district

11  judge and say you are sure what that judge is going to do.

12      **MR. STEIN:**  I will cite the Second Circuit cases for

13  you, your Honor.  I, frankly, didn't study -- I will cite the

14  second circuit cases that basically hold -- if you will give me

15  a moment, which I don't really have.

16      In the Second Circuit they will -- that judge will

17  defer to your Honor.  And if your Honor decides the case should

18  be here, will transfer the case.

19      **THE COURT:**  My only point, counsel, is that I think

20  you would be better served by simply suggesting that the law

21  would support an estimate or a guess that she would do that.

22      But to come in here and tell me that you are sure

23  what some judge is going to do in the Connecticut district --

24      **MR. STEIN:**  I thank your Honor for bringing that up

25  to me.

1      **THE COURT:**  I certainly would hope you wouldn't go to

2   that Court and tell them that you are sure I'm going to behave

3   in a certain kind of way.

4      **MR. STEIN:**  No, your Honor.  Thank you.

5      **THE COURT:**  All right.  Is there anything else you

6   wish to say?

7      **MR. RIFFER:**  No, your Honor.

8      **THE COURT:**  All right.  Matter stands submitted.  I

9   will give you a ruling now so that you will know where to go.

10      The Declaratory Judgment Act requires that the Court

11   balance a number of different considerations.  Both sides have

12   cited the appropriate cases.  You are aware that the Court has

13   a great deal of discretion whether or not to entertain an

14   action under the Declaratory Judgment Act.

15      Now, I certainly couldn't just as a matter of course

16   refuse to entertain a dec relief action, but there are other

17   considerations.

18      Generally, declaratory relief is appropriate when a

19   judgment rendered by the declaratory relief Court would serve a

20   useful purpose in clarifying or settling the legal

21   relationships of the parties before it, and when that

22   declaratory relief action will terminate the dispute and afford

23   a relief from uncertainty.  That's the whole purpose of having

24   the declaratory relief procedure.

25      In this case it is very clear that whatever, whatever

1  relief is ordered by this Court would not terminate the dispute

2  between the parties and would not afford the defendant the

3  relief that it's seeking in its action.  Its action is much

4  broader than the action that's pending in this Court and that

5  action would have to continue to be litigated.

6        I note that those -- the claims appear all to be

7  state law causes of action coming under New York law and

8  Connecticut law.  Clearly, a Connecticut or New York Court is

9  in a much better position than this Court to apply the laws of

10  those states.

11        So the overriding consideration that persuades me to

12  grant the motion to dismiss is that the action is not going to

13  be terminated by anything this Court does.

14        Secondarily, you have also raised the issue, and the

15  Court has given consideration, to the question of this race to

16  the courthouse.  I prefer to use the terminology that most of

17  the declaratory relief cases use, and that is apprehension.

18  Whether or not the lawsuit was filed in apprehension.

19        Now, I have declarations between you, Mr. Stein, and

20  Mr. Eisenberg that are more similar than they are dissimilar.

21  You disagree on who said what about when litigation would be

22  filed either by you or by Mr. Eisenberg on behalf of Jupiter,

23  but you don't disagree that you talked about litigation and

24  that Jupiterimages made it very clear that they wanted to seek

25  the additional damages under clause 6.1 of the contract.

1          The fact that you talked about litigation, the fact

2     that you told him that you would think about it over the

3     weekend, but, instead, filed a lawsuit the very next day, the

4     fact that the lawsuit you filed was a simply check-the-box form

5     complaint permitted in state court without any detail

6     whatsoever does suggest to me -- notwithstanding your

7     protestations to the contrary, but it does suggest to me that

8     you were attempting to perfect your client's position in having

9     a favorable forum, as you have indicated in your papers, and

10    that you did apprehend some litigation.

11          Now, there is a dispute as to how imminent that

12    litigation was likely to have been, but I find that it was

13    sufficiently imminent in your mind that you felt compelled to

14    not even wait the entire weekend, to instead check a box and

15    submit a complaint the next day.

16          Therefore, on the grounds of both the fact that the

17    lawsuit would not be resolved and the fact that I find that

18    there was some anticipation on your part, I find that sound

19    judicial administration indicates that the lawsuits, two

20    lawsuits of which there is no dispute that the parties are

21    identical, that the claims, whether or not they are the more

22    extensive state claims or the simple declaratory relief claims,

23     arise out of the same transaction.  It's this contract and the

24    interpretation of this contract under state law.  I find that

25    there would be no purpose served by proceeding in two

1  jurisdictions.

2          And given the other -- the considerations that I just

3  set forth, I find the Connecticut Court in a much better

4  position to deal with matters of state law, and particularly

5  given that those matters of state law would not be resolved by

6  a lawsuit here.

7          Therefore, I'm granting the motion to dismiss.

8  Motion to dismiss, obviously, is without prejudice.  You can

9  bring it in state court.  You can add it as a counterclaim in

10  -- I'm sorry, in Connecticut District Court, or you can add it

11  as a counterclaim if you don't wish to bring another action.

12          That's my ruling.  We are adjourned.

13          **MR. STEIN:**  Thank you.

14          **MR. RIFFER:**  Thank you.

15          (Whereupon, further proceedings in the

16           above matter were adjourned.)

17

18                        --oo--

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, DEBRA L. PAS, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 07-5540 PJH, STEVEN SHAPIRO vs JUPITERIMAGES, et al were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Friday, March 7, 2008